DON A. HERNANDEZ (SBN 125119)
*dhernandez@zuberlaw.com*
AGNES M. SULLIVAN (SBN 240388)
*asullivan@zuberlaw.com*
**ZUBER LAWLER & DEL DUCA LLP**
777 S. Figueroa Street, 37th Floor
Los Angeles, California 90017
Telephone: (213) 596-5620
Facsimile: (213) 596-5621

Attorneys for Plaintiff LOCAL INITIATIVE HEALTH
AUTHORITY FOR LOS ANGELES
COUNTY, operating and doing business as
L.A. CARE HEALTH PLAN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| LOCAL INITIATIVE HEALTH AUTHORITY FOR LOS ANGELES COUNTY, operating and doing business as L.A. CARE HEALTH PLAN, <br><br> Plaintiff, <br><br> v. <br><br> ONEBEACON PROFESSIONAL INSURANCE, INC., a Delaware corporation, ONEBEACON SPECIALTY INSURANCE COMPANY, a Pennsylvania corporation, and HOMELAND INSURANCE COMPANY OF NEW YORK, a New York corporation, and DOES 1-25, inclusive, <br><br> Defendants. <br><br> AND RELATED COUNTERCLAIMS | CASE NO. 2:16-cv-04810-VAP(AGRx) <br><br> [Assigned to Hon. Virginia A. Phillips, Ctrm. 8A] <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** <br><br> *[Filed concurrently with Notice of Motion; Separate Statement; Declarations Ellin Davtyan, Gregory Douglasand Don A. Hernandez; and [Proposed] Order]* <br><br> Judge: Hon. Virginia A. Phillips <br> Date: June 26, 2017 <br> Time: 2:00 p.m. <br> Crtrm.: 8A <br><br> Complaint Filed: 05/25/2016 <br> Discovery Cut-Off: 06/09/2017 <br> Pre-Trial Conf.: 08/27/2017 <br> Trial Date: 09/19/2017 |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ................................................................................ 1

II.     SUMMARY OF RELEVANT FACTS ............................................... 3

        A.      L.A. Care's Operations As A Public Managed Care Organization ........ 3

        B.      OBPI Underwrites And Issues Six Prior Managed Care E&O Policies To L.A. Care ................................................................. 4

        C.      OBPI Acts As Homeland's Attorney-in-Fact in Underwriting and Issuing The 2012 Policy to L.A. Care ................................ 5

        D.      Lancaster Hospital Corporation Sues L.A. Care For Errors Allegedly Committed by L.A. Care In Its Handling Of Lancaster Hospital's Claims for Payment ................................... 7

        E.      L.A. Care Timely Provides Notice Of The Claim To Homeland ........... 8

        F.      The Superior Court Dismisses LHC's Implied Contract Claims ......... 10

        G.      Defendants Refused to Participate in the Mediation or Contribute to the Settlement ............................................................. 10

III.    L.A. CARE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW THAT THE 2012 POLICY PROVIDES INDEMNIFICATION COVERAGE FOR L.A. CARE'S SETTLEMENT WITH LHC. .................. 12

        A.      Defendants Admit That the LHC Action Constituted a Claim Involving a Managed Care Activity ......................................... 13

        B.      The Plain Language of Exclusion (4) Does Not Apply to the LHC Action Settlement ....................................................... 15

        C.      Defendants' Construction of Exclusion (4) Would Render Illusory the Coverage Provided by the 2012 Policy. ........................... 18

        D.      Exclusions (2) and (3) Also Do Not Apply to the Settlement .............. 20

IV.     DEFENDANTS HAVE BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AS A MATTER OF LAW ........ 21

V.      CONCLUSION ................................................................................ 24

2193-1003 / 723283.1

# TABLE OF AUTHORITIES

**Page**

## CASES

*AIU Ins. Co. v. Sup. Ct.*
  51 Cal. 3d 807 (1990) ................................................................. 21

*Century Sur. Co. v. Gene Pira, Inc.*
  2014 WL 6474987 (C.D. Cal. 2014) ..................................... 18, 19

*Fire Ins. Exch. v. Sup. Ct.*
  116 Cal. App. 4th 446 (2004) ................................................... 18

*Fleming v. Safeco Ins. Co. of America, Inc.*
  160 Cal. App. 3d 31 (1984) ....................................................... 23

*Haynes v. Farmers Ins. Exchange*
  32 Cal. 4th 1198 (2004) ............................................................ 13

*Health Net, Inc. v. RLI Ins. Co.*
  206 Cal. App. 4th 232 (2012) ................................................... 17

*MacKinnon v. Truck Ins. Exchange*
  31 Cal. 4th 635 (2003) .............................................................. 16

*Palmer v. Truck Ins. Exch.*
  21 Cal. 4th 1109 (1999) ............................................................ 20

*Safeco Ins. Co. of America v. Robert S.*
  26 Cal. 4th 758 (2001) .............................................................. 20

*Silberg v. California Life Ins. Co.*
  11 Cal. 3d 452 (1974) ............................................................... 23

*State Farm Mut. Auto. Ins. Co. v. Partridge*
  10 Cal. 3d 94 (1973) ........................................................... 13, 16

*Vandenberg v. Superior Court*
  21 Cal. 4th 815 (1999) .............................................................. 17

*Waller v. Truck Ins. Exch., Inc.*
  11 Cal. 4th 1 (1995) .................................................................. 16

## STATUTES

42 U.S.C. § 1396u-2(b)(2)(D) ........................................................ 17

Bus. & Prof. Code § 17203 ............................................................ 21

Bus. & Prof. Code §§ 17200 ..................................................... 20, 22

Bus. & Prof. Code §§ 17500.........................................................................21

Cal. Civ. Code § 1641...............................................................................18

Case No. 2:16-cv-04810-VAP(AGRx)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

2193-1003 / 723283.1

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiff Local Initiative Health Authority for Los Angeles County, operating and doing business as L.A. Care Health Plan ("L.A. Care"), is a public entity and managed care organization dedicated to providing health coverage to the most vulnerable residents of Los Angeles County.  It does so through a network of contracts with federal and state agencies, health plan partners, hospitals, and other healthcare providers.  Defendants Homeland Insurance Company of New York ("Homeland") and OneBeacon Professional Insurance, Inc. ("OBPI") (together, "Defendants") are part of the OneBeacon Insurance Group, a collection of dozens of affiliated insurance and holding companies that have a variety of domestic and international domiciles.

This action arises from an illusory insurance policy that Defendants marketed and sold to L.A. Care.  As shown below, OBPI marketed a particular insurance product – a Managed Care Errors & Omissions Policy – to managed care organizations on the premise that it would indemnify them for damages they are legally obligated to pay due to errors in their performance of managed care activities. The term "managed care activities" includes disputes with medical providers, such as physicians and hospitals.

In reliance upon this marketing, L.A. Care purchased at least seven annual Managed Care Error & Omissions policies from OBPI, paying premiums totaling several hundred thousand dollars.  OBPI accepted the money and used two other captive companies within the OneBeacon Insurance Group to issue the policies.  At no point before it believed it might actually go out of pocket did OBPI advise L.A. Care that it believed the policies did not cover the bulk of L.A. Care's managed care activities.  Even then, it took a position contrary to its own "reservation of rights" letter that stated, "coverage under the Policy has therefore been triggered."

/ / /

1   L.A. Care seeks to be indemnified for its settlement of a lawsuit by a non-
2   contracted hospital provider.  As acknowledged by OBPI, the lawsuit was covered by
3   the Managed Care Errors & Omission Policy underwritten by OBPI and issued by
4   Homeland for the policy period April 1, 2012 through April 1, 2013.  In that prior
5   lawsuit, the non-contracted hospital claimed that L.A. Care miscalculated the rates
6   allegedly set by statute and regulations for emergency room and post-stabilization
7   services that the hospital had provided to L.A. Care's members.  L.A. Care denied
8   those allegations.

9   Defendants have refused to indemnify L.A. Care for its loss.  As justification,
10   Defendants principally rely upon the policy's definition of "Damages," which
11   excludes any amounts that L.A. Care is obligated to pay under a contract.  L.A. Care's
12   settlement with the non-contracted provider falls outside the plain language of the
13   exclusion.  Even so, Defendants distort the plain language of the exclusion to include
14   settlements with a non-contracted provider who claims that was a third-party
15   beneficiary of contracts between L.A. Care and other entities – even if the factual
16   issue of whether it was an intended third-party beneficiary was never adjudicated.

17   Defendants' tortured construction violates several principles of California law
18   pertaining to the interpretation of liability policies, as set forth below.  It also renders
19   illusory the coverage purportedly provided by the policy's other provisions –
20   coverage that L.A. Care thought it had obtained when it paid the Defendants $140,000
21   for the policy in 2012.  As such, it must be rejected.  The Court should determine as a
22   matter of law that the policy at issue covers Plaintiff's loss.

23   Defendants also breached the implied covenant of good faith and fair dealing,
24   as a matter of law, by failing to provide a definitive position as to coverage in a timely
25   fashion.  They waited for well over a year – after L.A. Care requested their
26   participation in the mediation – to issue a definitive statement that any settlement with
27   the hospital was not covered, a position that was contrary to OBPI's earlier statement
28   that coverage under the 2012 Policy had been "triggered."  L.A. Care's damages from

1 the Defendants' breach of the implied covenant include the settlement (reduced by

2 whatever balance remains of the $250,000 self-insured retention), as well as the costs

3 and fees incurred to recover the benefits due it under the policy.  Judgment in favor of

4 L.A. Care should be entered on this claim as well.

5 **II.   SUMMARY OF RELEVANT FACTS**

6    **A.   L.A. Care's Operations As A Public Managed Care Organization**

7        L.A. Care is the largest public health plan in the country.  It is an independent

8 public agency that serves predominantly indigent residents of Los Angeles County.  It

9 receives most of its funding through a contract with the DHCS, which pays L.A. Care

10 a certain dollar amount each month for each member in L.A. Care's Medi-Cal line of

11 business. Undisputed Material Fact ("UMF") No. 1.

12        L.A. Care does not directly provide healthcare services to its members.  Rather,

13 it relies upon many healthcare providers in Los Angeles County, including hospitals

14 and physician groups, to deliver the care.  L.A. Care gains access to some of these

15 providers through contracts with its health plan partners, including Anthem Blue

16 Cross of California, Care 1st Health Plan, and Community Health Plan (CHP).  L.A.

17 Care also contracts directly with many healthcare providers, including physicians,

18 hospitals and physician groups to provide care to its Medi-Cal members  .  UMF No.

19 2.  Some providers in Los Angeles County, however, have strategically elected not to

20 enter into contracts with L.A. Care.  When L.A. Care's Medi-Cal members seek

21 emergency services at these non-contracted providers, a combination of statutes,

22 regulations and directives from the relevant federal and state agencies set the rates of

23 payment for the emergency and post-stabilization services that they provide to L.A.

24 Care's members.  UMF No. 3.

25        A large portion of L.A. Care's ordinary managed care activities include the

26 processing and adjudication of claims for payment by both contracted and non-

27 contracted providers.  The claims that it handles, in fact, are those that are submitted

28 by providers to L.A. Care for payment.  L.A. Care's managed care activities also

1  include the retrospective review and adjustment of claims for proper payment.  UMF

2  No. 4.

3  **B.    OBPI Underwrites And Issues Six Prior Managed Care E&O**

4  **Policies To L.A. Care**

5  The "OneBeacon Insurance Group" is an opaque collection of offshore and

6  domestic companies that offer different kinds of insurance and financial services.

7  Though numbering literally in the dozens, all of these entities fall under common

8  management and control.  So much so that the companies issue consolidated financial

9  statements to their investors and regulators.  UMF No. 5.

10  OBPI was first brought to L.A. Care's attention by L.A. Care's insurance

11  broker, Marsh McLennan Agency ("Marsh").  Coverage for managed care errors and

12  omissions was part of an overall package of policies that Marsh presented to L.A.

13  Care every spring.  Other coverages included directors and officers, employment

14  practices liability and general liability.  UMF No. 6.

15  L.A. Care purchased "OneBeacon" Managed Care Errors and Omission

16  Policies each year since 2006 to insure against claims by members and providers that

17  it had committed errors and omissions in performing its ordinary managed care

18  activities.  The premium that L.A. Care paid for its managed care errors and

19  omissions policy was one of the largest, if not the largest, insurance premiums that

20  L.A. Care paid each year.  UMF No. 7.

21  OBPI underwrote six Managed Care Errors & Omission policies to L.A. Care

22  for the period 2006 through 2011.  It collected substantial premiums for each of these

23  policies, totaling several hundred thousand dollars.  UMF No. 8.  From the materials

24  that L.A. Care provided each year in support of its renewal applications, OBPI knew

25  that: L.A. Care was a public agency whose members were beneficiaries of the

26  California's Medi-Cal program; that L.A. Care derives most of its revenue from its

27  contract with DHCS; and that L.A. Care's primary business activities did *not* include

28  / / /

4

1  the "billing/other processing of enrollees' claims under health care plans."  UMF No.

2  9.

3        OBPI elected (for whatever reasons) to issue the policies through two different

4  captive insurance companies, Homeland and Employers' Fire Insurance Company.

5  OBPI used Employers' Fire to issue most of the policies in the years leading to 2012,

6  including the 2011 Policy.  Most were issued using a "2006 Form" that was admitted

7  within California to sell to California insureds.  UMF No. 10.  Never once did OBPI

8  advise L.A. Care that the policies might not cover the bulk of L.A. Care's managed

9  care activities.

10       **C.    OBPI Acts As Homeland's Attorney-in-Fact in Underwriting and**

11            **Issuing The 2012 Policy to L.A. Care**

12       Along with its other insurance policies, L.A. Care's Managed Care E&O Policy

13  came up for renewal during March 2012.  Marsh again contacted OBPI for managed

14  care errors and omission coverage.  On L.A. Care's behalf, Marsh submitted L.A.

15  Care's application for renewal of the prior policy.  As before, these materials included

16  financial statements from L.A. Care's auditor that described L.A. Care's business, the

17  sources of its revenue and its expenses.  UMF No. 11.

18       L.A. Care's application form for the 2012 policy identified four open claims

19  that L.A. Care had submitted under its 2011 Managed Care E&O Policy.  One of

20  these was a claim by Presbyterian Community Hospital, which was identified as a

21  non-contracted provider, that L.A. Care had allegedly underpaid for services provided

22  to L.A. Care's members.  OBPI's underwriter considered the existence of these four

23  claims, along with the substantial growth in L.A. Care's membership, as factors in

24  quoting a $140,000 premium to renew the policy for 2012.  UMF No. 12.

25       For reasons that have not yet been revealed, OBPI decided to use a new form

26  for its 2012 Managed Care E&O policy called the "Level 1 Form."  Unlike the prior

27  2006 Form, the Level 1 Form was not admitted in California.  Consequently, in order

28  to issue the new policy, OBPI required that Marsh execute a "surplus lines

5

Case No. 2:16-cv-04810-VAP(AGRx)

2193-1003 / 723283.1

1   certificate."  Marsh agreed to execute the document and, on L.A. Care's behalf,

2   instructed OBPI to "bind" coverage on March 29, 2012.  UMF No. 13.

3        Though it had issued the prior several policies through Employers' Fire

4   Insurance Company, OBPI elected to issue Managed Care E&O Policy MCR-5583-12

5   ("the 2012 Policy") through Homeland for the policy period April 1, 2012 through

6   April 1, 2013.  UMF No. 14.  The 2012 Policy contained the following insuring

7   clause, quoted in pertinent part:

8        **We** will pay on **your** behalf **Damages**[1] and **Claims Expenses**[2] in excess

9        of the Retention that you are legally obligated to pay as a result of a

10       **Claim**[3] for . . . an act, error, or omission, or series of acts, errors, or

---

12  [1]   The 2012 Policy provides in pertinent part that, "**Damages** means any settlements,

13  judgments . . . in an amount equal to the percentage that any **Damages** covered under

14  this Policy for any settlement or judgment bear to the total amount of such judgment or settlement, . . . which you are legally obligated to pay as a result of a **Claim**.

15  **Damages** does not include:

16      (2)   any non-monetary or equitable relief or redress, including but not limited

17      to any cost or expense of complying with any injunctive, declaratory, or administrative relief or specific performance award;

18      (3)   any payment, restitution, return, or disgorgement of any fee, profit,

19      royalty, premium commission, or charge, or any fund allegedly wrongfully or

20      unjustly held or obtained, including but not limited to any profit, remuneration or advantage to which you were not legally entitled;

21      (4)   any amount any of you pay or may be obligated to pay under any

22      contract or agreement, including but not limited to any policy, bond, benefit plan, or provider agreement."

23  [2]   The 2012 Policy provides in relevant part that, "**Claim Expenses** means the

24  reasonable and necessary legal and expert fees and expenses incurred in the

25  investigation, adjustment defense or appeal of any **Claim** . . ."

26  [3]   The 2012 Policy provides in relevant part that, "**Claim** means any written demand

27  (including a written demand in electronic form) from any person or entity seeking money or services or civil, injunctive, or administrative relief from you."

28

2193-1003 / 723283.1

1    omissions, committed or allegedly committed by you or on your behalf

2    in the performance of a **Managed Care Activity**.[4]

3    "We" in the 2012 Policy refers to Homeland and the terms "you" and "your" refer to

4    L.A. Care.  The "self-insured retention" (the "SIR" - similar to a "deductible"), that

5    L.A. Care agreed to be responsible for, was $250,000.  The 2012 Policy provided a

6    $10 million limit for each claim of liability.  UMF No. 15.

7    OBPI sent a copy of the 2012 Policy to L.A. Care on or about June 15, 2012,

8    over two months after the policy period had begun.  UMF No. 16.

9    **D.**    **Lancaster Hospital Corporation Sues L.A. Care For Errors**

10    **Allegedly Committed by L.A. Care In Its Handling Of Lancaster**

11    **Hospital's Claims for Payment**

12    On or about February 1, 2013, L.A. Care received a letter from Lancaster

13    Hospital Corporation ("LHC") demanding further payment for emergency and post-

14    stabilization services that it had provided to L.A. Care's members during the period

15    April 6, 2009, through February 1, 2013.  UMF No. 17.

16    LHC asserted that it was entitled to what it claimed was the full Medi-Cal fee-

17    for-service rate for emergency and post-stabilization services that it had provided to

18    L.A. Care's members in accordance with statutory and regulatory directives.  That

19    rate, LHC alleged, was different than what L.A. Care had paid it.  LHC demanded

20    payment of damages that it claimed it had suffered as a result of errors and omissions

21    by L.A. Care in its performance of claims services.  UMF No. 18.

22    LHC filed a complaint with the Los Angeles County Superior Court on

23    March 29, 2013 (the "LHC Action").  UMF No. 19.  In it, LHC emphasized that it

24

25    [4]   The 2012 Policy provides in relevant part that, "**Managed Care Activity** means

26    any of the following services or activities . . . whether performed by **you** or on **your**

27    behalf: **Provider Selection**; **Utilization Review**; . . . **Claim Services**; establishing health care provider networks including tiered networks; . . . and services or activities

28    performed in the administration or management of health care  . . ."

1   had no contract with L.A. Care.  LHC claimed that a federal statute and the DHCS

2   mandated that L.A. Care pay its non-contracted providers rates different from those

3   that L.A. Care paid pursuant to applicable regulations and All Plan Letters issued by

4   DHCS.  Specifically, LHC asserted, without foundation, that the appropriate rates

5   were equivalent to LHC's reimbursement or "interim" rate with the Government (i.e.,

6   20% of billed charges).  LHC claimed that L.A. Care instead had paid it different

7   rates for these services.  UMF No. 20.

8       The Complaint's first cause of action sought a judicial declaration of the

9   parties' rights and responsibilities.  Four other causes of action were based upon the

10   contention that L.A. Care and LHC were parties to implied contracts that required

11   L.A. Care to pay LHC its full interim rates for emergency and post-stabilization

12   services.  The last two causes of action contended that LHC was a third-party

13   beneficiary of L.A. Care's contracts with DHCS, Care 1st and CHP.  It asserted,

14   without foundation, that these contracts all required L.A. Care to pay its non-

15   contracted providers 100% of their interim rates for these services.  UMF No. 21.

16       The Complaint sought both equitable and legal relief, including an award of

17   "damages in an amount to be proved at trial."  UMF No. 22.

18       L.A. Care denied all of LHC's allegations.  It contended instead that it had paid

19   LHC exactly what it was required to pay by statutes, regulations, and DHCS

20   directives.  UMF No. 23.  Importantly, the LHC Action did not arise from a deliberate

21   decision by L.A. Care to underpay a provider, but its reading of the applicable law.

22       **E.    L.A. Care Timely Provides Notice Of The Claim To Homeland**

23       On March 27, 2013, L.A. Care provided timely notice to Homeland of the LHC

24   claim.  L.A. Care also subsequently provided a file-stamped copy of the LHC

25   Complaint once it had been served.  UMF No. 24.

26       As early as April 25, 2013, unbeknownst to L.A. Care and based solely on the

27   Demand letters and Complaint and, OBPI decided  that Homeland had "[n]o apparent

28   indemnity exposure, as the defendant [sic] is seeking declaratory and equitable relief,

restitution, money owed under a contract, and interest on money owed."  OBPI therefore made the decision that "no reserves required at this time while we see how this unfolds."  UMF No. 25.

OBPI acknowledged receipt of the claim on May 3, 2013, as Homeland's "claims manager" for the 2012 Policy.  UMF No. 26.  In its letter, OBPI said the following:

> We have determined that the LETTERS and COMPLAINT constitute a **Claim** involving a **Managed Care Activity** that was first made when [L.A. Care] received the first of the LETTERS, *and coverage under the Policy has therefore been triggered.*  (emphasis added)

UMF No. 27.  OBPI also quoted in full the definition of **Damages**.  OBPI then said the following: "We note that [LHC's] Prayer *includes* relief that does not constitute **Damages**.  Please be aware that any relief or settlement amount that does not constitute **Damages** is not covered."  (emphasis added)  UMF No. 28.

OBPI did not advise L.A. Care that it had already determined that there was "[n]o apparent indemnity exposure, as the defendant [sic] is seeking declaratory and equitable relief, restitution, money owed under a contract, and interest on money owed."  In fact, it took no other position with respect to coverage until over one year later, on May 29, 2014, when it feared L.A. Care's loss might exceed the SIR.

OBPI accepted L.A. Care's chosen defense counsel.  But it agreed to credit L.A. Care's $250,000 self-insured retention amount ("SIR") by a significantly lower hourly rate ($320 or $325) than L.A. Care paid its counsel, which was a blended hourly rate of $550.  UMF No. 29.

L.A. Care repeatedly requested that OBPI provide an accurate accounting of the fees and costs that had been credited towards the SIR.  But OBPI, only provided partial accountings.  In fact, Defendants have never provided a complete and accurate accounting of L.A. Care's SIR balance.  UMF No. 30.

/ / /

1    **F.      The Superior Court Dismisses LHC's Implied Contract Claims**

2        L.A. Care demurred to LHC's Complaint on the grounds that, as a public

3    agency, it could not be deemed a party to an implied contract.  The Court sustained

4    the demurrer and granted LHC leave to amend.  UMF No. 31.

5        LHC filed a First Amended Complaint in November 2013.  L.A. Care and its

6    counsel sent OBPI copies of the pertinent pleadings.  UMF No. 32.  L.A. Care also

7    demurred to the First Amended Complaint arguing that, as a public entity, it was not

8    subject to common law or judicially declared forms of liability pursuant to Cal. Gov.

9    Code § 815, and cannot be sued on implied-in-law or quasi-contract theories of

10   liability.  UMF No. 33.

11       The Superior Court sustained L.A. Care's demurrer to the first five causes of

12   action of LHC's First Amended Complaint without leave to amend.  With respect to

13   the remaining two causes, the Court overruled L.A. Care's demurrer on the grounds

14   that the question of whether a party is an intended third-party beneficiary is generally

15   a question of fact inappropriate for resolution by demurrer.[5]  UMF No. 34.

16   **G.      Defendants Refused to Participate in the Mediation or Contribute to**

17   **the Settlement**

18       Having secured the dismissal of all but two of the seven claims against it, L.A.

19   Care agreed to mediate the remainder of the dispute rather than continue to incur

20   **Claim Expenses**.  The parties to the LHC Action agreed to a mediation scheduled for

21   July 21, 2014.  UMF No. 35.

22       L.A. Care provided OBPI with notice of the forthcoming mediation on May 22,

23   2014.  UMF No. 36.  OBPI responded by email a week later, on May 29, 2014,

24

25
_____

26   [5]   That issue was never resolved.  It should be noted that Care 1st's Contract with
     Plaintiff – one of the two relied upon by LHC for its 7th cause of action – expressly

27   provides, "[n]either Members nor any other third parties are intended by the parties to
     be third party beneficiaries under this Agreement, and no action to enforce the terms

28   of this Agreement may be brought against either party by any person who is not a
     party hereto."

1  asserting that, "the relief sought by Lancaster Hospital does not constitute Damages as

2  defined by the Policy, and any relief or settlement amount that does not constitute

3  Damages is not covered."  UMF No. 37.  The email then concluded:

4      Along with declaratory and equitable relief, Lancaster Hospital is

5      seeking payment of its fees for services provided to Medi-Cal

6      beneficiaries enrolled in L.A. Care Health Plan.  Therefore, a

7      settlement payment is not covered by the Policy, and we will not be

8      contributing to any settlement that may be reached at the upcoming

9      mediation.  Please feel free to contact me if there is anything you

10     would like to discuss.  *Id.*

11  This was the first communication regarding coverage that OBPI had sent to L.A. Care

12  for over a year. However, the email was wrong in the following respects: (1) the May

13  3, 2013 reservation of rights letter actually said that coverage under the 2012 Policy

14  had been triggered; (2) it did not say that the entirety of relief sought by LHC fell

15  outside the definition of **Damages**; rather, it said the prayer *included* relief that did

16  not constitute **Damages**; (3) the Superior Court had sustained without leave to amend

17  L.A. Care's demurrer to LHC's first cause of action for declaratory relief, so that

18  equitable relief no longer was being sought; (4) there were no claims in the LHC

19  Action that L.A. Care and LHC were parties to an express or implied contract; and (5)

20  LHC's First Amended Complaint sought the recovery of **Damages** as that term was

21  defined by the 2012 Policy.

22      L.A. Care responded to OBPI on July 14, 2014.  UMF No. 38.  It disputed

23  OBPI's refusal to participate in the mediation, particularly OBPI's reliance upon the

24  breach of contract exclusion because L.A. Care did not have any contracts with LHC.

25  L.A. Care further noted that the lawsuit did not involve any breach of contract claim,

26  but instead focused on whether L.A. Care applied the correct regulatory rate to the

27  emergency and post-stabilization services that LHC provided to L.A. Care's

28  members.  With respect to the two remaining third-party beneficiary claims, L.A.

1   Care noted that the Court had not yet adjudicated the issue of whether LHC was an
2   intended third-party beneficiary of the three identified contracts.

3          OBPI responded on July 16, 2014.  UMF No. 39.  It confirmed that neither it
4   nor Homeland would participate in the mediation or contribute to any settlement on
5   the grounds that, to prevail on its remaining legal theories, LHC would be required to
6   demonstrate, among other things, that it was an intended third-party beneficiary of the
7   three referenced contracts and that those contracts provided the correct rates.[6]  OBPI
8   then added the new argument that any settlement would represent payments for
9   amounts that that been "wrongfully or unjustly held" or payments that L.A. Care
10  "would be obligated to pay under any contract or agreement."

11         L.A. Care participated in two mediation sessions, all the while advising OBPI
12  of the progress of negotiations.  UMF No. 40.  OBPI repeatedly and consistently
13  stood on its refusal to participate or contribute to the settlement, even though it had
14  acknowledged that LHC's **Claim** against L.A. Care involved a **Managed Care**
15  **Activity**, and that, "coverage under the Policy has therefore been triggered."

16         L.A. Care ultimately agreed to settle the LHC Action.  UMF No. 41.  It spent
17  $268,813.83 in **Claims Expenses** defending the LHC Action, including $261,140.50
18  in attorneys' fees and $7,673.33 in costs.  UMF No. 42.

19  **III.   L.A. CARE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW**
20  **        THAT THE 2012 POLICY PROVIDES INDEMNIFICATION**
21  **        COVERAGE FOR L.A. CARE'S SETTLEMENT WITH LHC.**

22         The central issue in this litigation is whether the 2012 Policy provided
23  indemnification coverage for L.A. Care's settlement of the LHC Action.  L.A. Care

_____

25  [6]   It was not until discovery in this action that the Defendants first requested to
26  actually see the contracts that LHC referenced in its First Amended Complaint. In
    point of fact, as set forth above, L.A. Care was following the instructions of DHCS
27  when it continued to pay the lower rates to LHC and other non-contracted providers
28  after November 18, 2009.

12

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1   contends that the settlement of a **Claim Services** dispute with a non-contracted

2   provider (a **Claim** involving a **Managed Care Activity**) is covered under the policy's

3   insuring clause.  Defendants agree that the LHC Action is a **Claim** involving a

4   **Managed Care Activity**.  But, in refusing to indemnify L.A. Care, they improperly

5   read three exclusions to the definition of **Damages** to include disputes with non-

6   contracted providers who allege that L.A. Care failed to pay the rates prescribed by

7   statutes, regulations and agency directives.  Such a broad reading in the context of

8   L.A. Care's managed care activities would render illusory the Managed Care Errors &

9   Omissions Policy that it purchased from the Defendants.  It also would be contrary to

10  California law.

11      Summary judgment is proper when "there is no genuine dispute as to any

12  material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

13  P. 56(a).  Where, as here, the material facts are not in dispute, the interpretation of an

14  insurance policy presents solely a question of law.  *Haynes v. Farmers Ins. Exchange*,

15  32 Cal. 4th 1198, 1204 (2004); *State Farm Mut. Auto. Ins. Co. v. Partridge*, 10 Cal.

16  3d 94, 100 (1973).

17      A.    <u>Defendants Admit That the LHC Action Constituted a Claim</u>

18            <u>Involving a Managed Care Activity</u>

19      The insuring clause of the 2012 Policy provides in pertinent part that

20  Homeland, "will pay on [L.A. Care's] behalf **Damages** and **Claim Expenses** in

21  excess of the Retention that [L.A. Care is] legally obligated to pay as a result of a

22  **Claim** for . . . an act, error, or omission, or series of acts, errors, or omissions,

23  committed or allegedly committed by [L.A. Care] . . . in the performance of a

24  **Managed Care Activity**."

25      The Policy defines **Claim** as "any written demand (including a written demand

26  in electronic form) from any person or entity seeking money or services or civil,

27  injunctive, or administrative relief from **you**."  It defines **Managed Care Activity** as

28

13

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

2193-1003 / 723283.1

"**Provider Selection**;[7] **Utilization Review**;[8] . . . **Claim Services**;[9] establishing health care provider networks including tiered networks; . . . and services or activities performed in the administration or management of health care . . ."  By its very definition **Claim Services** includes the submission, handling, the adjudication and payment of **Claims**.

As set forth above, OBPI in its May 3, 2013 "reservation of rights" letter admitted that the LHC demand letter and complaint constituted a **Claim** involving a **Managed Care Activity**, and that "*coverage under the Policy [had] therefore been triggered.*"  (emphasis added)  OBPI thus conceded that the Policy's insuring clause covers the errors and omissions that LHC alleged in its Complaint against L.A. Care and the Policy does in fact provide coverage.

As a managed care organization, L.A. Care's **Claim Services** consist principally of the processing of claims for payment by its non-contracted and contracted providers.  They do not typically include the processing of claims by its members.  Indeed, in its application for the 2012 Policy, L.A. Care specifically

---

[7]  The 2012 Policy provides that, "**Provider Selection** means any of the following, but only if performed by **you** or on **your** behalf: evaluating, selecting, credentialing, contracting with or performing peer review of any provider of **Medical Services**."  It further provides that, "**Medical Services** means health or medical care or treatment provided or prescribed to any person . . ."

[8]  The 2012 Policy provides in pertinent part that, "**Utilization Review** means the process of evaluating the appropriateness, necessity or cost of **Medical Services** for the purposes of determining whether payment or coverage for such **Medical Services** will be authorized or paid . . . In clarification and not in limitation of the foregoing, **Utilization Review** will include . . . retrospective review of already rendered **Medical Services** or already incurred costs."

[9]  The 2012 Policy provides in pertinent part that, "**Claim Services** means the following services, but only if performed by **you** or on **your** behalf: the submission, handling, investigation, adjudication, denial, payment, or adjustment of claims for benefits or coverages under health care . . ."

14

Case No. 2:16-cv-04810-VAP(AGRx)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1  advised OBPI/Homeland that its business activities did not include the "billing/other

2  processing of enrollees' claims under health plans."  So, Defendants knew that the

3  only claims that L.A. Care handled came from its contracted and non-contracted

4  providers.

5       L.A. Care's handling, adjudication, payment and adjustment of its non-

6  contracted providers claims for payment fall squarely within the 2012 Policy's

7  definitions of **Claim Services** ("the submission, handling, investigation, adjudication,

8  denial, payment, or adjustment of claims for benefits or coverages under health care .

9  . .") and **Utilization Review** ("the process of evaluating the appropriateness, necessity

10  or cost of **Medical Services** for the purposes of determining whether payment or

11  coverage for such **Medical Services** will be authorized or paid . . . In clarification and

12  not in limitation of the foregoing, **Utilization Review** will include . . . retrospective

13  review of already rendered **Medical Services** or already incurred costs"). The

14  gravamen of LHC's claims against L.A Care centered around the handling,

15  adjudication, payment and adjustment of it's claims for emergency and post-

16  stabilization services.

17       Consequently, in order to avoid liability for indemnification, Homeland must

18  prove that the settlement with LHC falls within an exclusion to the insuring clause.

19      **B.**       **The Plain Language of Exclusion (4) Does Not Apply to the LHC**

20               **Action Settlement.**

21       OBPI, as Homeland's claims manager, relies upon three exclusions to the

22  definition of **Damages** within the 2012 Policy to refuse to participate in the mediation

23  or contribute to the settlement of the LHC Action:

24       •    Exclusion (2), which excludes any non-monetary or equitable relief;

25       •    Exclusion (3), which excludes payments of unjustly obtained funds; and,

26       •    Exclusion (4), which excludes payment of any damages arising out of a

27             contractual obligation.

28

15         Case No. 2:16-cv-04810-VAP(AGRx)

1    It has long been settled under California law that exceptions to coverage must

2    be read narrowly, and insuring clauses broadly.  *See, e.g., MacKinnon v. Truck Ins.*

3    *Exchange*, 31 Cal. 4th 635, 647-48 (2003); *State Farm Mut. Auto. Ins. Co. v.*

4    *Partridge*, 10 Cal. 3d 94, 101-02 (1973).

5    Defendants focus primarily on Exclusion (4), which provides, in pertinent part,

6    that the term **Damages** does not include, "any amount any of **you** pay or may be

7    obligated to pay under any contract or agreement, including but not limited to any

8    policy, bond, benefit plan, or provider agreement."  The plain language of Exclusion

9    (4) concerns contractually-required payments, such as those that the insured would be

10   required to pay under a provider agreement, which the exclusion specifically

11   references.  *See Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995) ("The rules

12   governing policy interpretation require us to look first to the language of the contract

13   in order to ascertain its plain meaning or the meaning a layperson would ordinarily

14   attach to it").

15   Exclusion (4) does not preclude coverage for the LHC settlement because LHC

16   was never a contracted provider, as evident even from LHC's pleadings.  Indeed, the

17   central theme of LHC's contentions against L.A. Care was that LHC was entitled to

18   its full "interim" rate *because it was **not** a contracted provider.*  Moreover, the

19   Superior Court sustained, without leave to amend, L.A. Care's demurrer to those

20   causes of action that were based upon implied-in-law or quasi-contract theories.

21   Hence, at the time of settlement, there was no claim that L.A. Care and LHC were

22   parties to an express or implied contract.

23   Defendants contend, however, that for LHC to prevail on its two remaining

24   claims against L.A. Care, it would have been required to demonstrate, first, that it was

25   a third-party beneficiary of three contracts between L.A. Care and other entities

26   (DHCS, Care 1st and CHP), and, second, that those contracts required L.A. Care to

27   pay LHC the rates claimed by LHC.  L.A. Care's settlement of the LHC Action,

28   Defendants contend, therefore falls within Exclusion (4).

16

Case No. 2:16-cv-04810-VAP(AGRx)

1    The California Supreme Court has instructed the courts of this State that

2    coverage under a liability policy should not be based upon the fortuity of the form of

3    action chosen by the injured party.  *Vandenberg v. Superior Court*, 21 Cal. 4th 815,

4    838 (1999) (holding that coverage is not necessarily precluded because they were pled

5    as contractual damages).  Rather, coverage must be based upon a consideration of,

6    among other things, the nature of the injury, the risk that caused the injury and the

7    particular provisions of each applicable insurance policy.  *Id.*, at 838, 841 (*quoting* 9

8    Couch, Insurance (3d ed. 1997), § 126:3, pp. 126-8).

9    LHC quite plainly asserted that L.A. Care had erred in failing to pay LHC its

10   full "interim" rate as required by a federal statute, 42 U.S.C. § 1396u-2(b)(2)(D), not

11   a rate set by a specific contractual provision.  The "nature of the injury," therefore,

12   was that L.A. Care had supposedly violated a statute.  And, the "risk" was that L.A.

13   Care had erred in processing LHC's claims for payment.  LHC was simply –

14   fortuitously – attempting to use general language contained within the DHCS, Care

15   1st and CHP contracts that did not specifically dictate payment rates, to "bootstrap"

16   standing to enforce the federal statute.

17   Under these circumstances, Exclusion (4) did not apply.  *See Health Net, Inc. v.*

18   *RLI Ins. Co.*, 206 Cal. App. 4th 232, 254-255 (2012) (a claim that payments made by

19   a health plan to out-of-network providers fell short of the rates required by regulation

20   is not precluded by liability policy provision excluding damages for breach of

21   contract).

22   On a more general note, Defendants now contend that liability policies such as

23   the 2012 Policy are not meant to cover provider disputes.  They claim that, otherwise,

24   health plans like L.A. Care would be motivated to underpay their providers and turn

25   to their liability insurers to pick up the shortfall.  There are two reasons to reject that

26   logic in this specific context: (1) L.A. Care did not deliberately decide to underpay

27   LHC, it was instructed to pay specific rates by law; and (2) Based upon their

28   experience in underwriting six prior Managed Care Errors & Omissions policies to

17

1  L.A. Care, Defendants knew that the bulk of its managed care activities consisted of

2  processing claims for payment by contracted and non-contracted providers.  It would

3  have been a simple matter for the Defendants to specifically exclude rate disputes

4  with L.A. Care's non-contracted providers from coverage, either within the language

5  of the "Level 1 Form" or in an endorsement.  They did not. That omission must be

6  construed against them.

7  **C.**     **<u>Defendants' Construction of Exclusion (4) Would Render Illusory</u>**

8          **<u>the Coverage Provided by the 2012 Policy.</u>**

9       Defendants' tortured, broad construction of Exclusion (4) should also be

10  rejected for the additional reason that it would render meaningless whole sections of

11  the 2012 Policy.

12       It is well-settled that all of the provisions of an insurance policy must be read

13  together to give as much meaning as possible to each of them.  Cal. Civ. Code § 1641

14  ("The whole of a contract is to be taken together, so as to give effect to every part, if

15  reasonably practicable, each clause helping to interpret the other").  *Fire Ins. Exch. v.*

16  *Sup. Ct.*, 116 Cal. App. 4th 446, 454 (2004).  As Judge Pregerson of this Court has

17  noted, California law prohibits interpreting an exclusion in a manner that renders

18  illusory the coverage provided by a policy's other provisions. *Century Sur. Co. v.*

19  *Gene Pira, Inc.*, 2014 WL 6474987, at *3 (C.D. Cal. 2014).

20       Defendants' construction of Exclusion (4), first and foremost, would render

21  illusory the coverage provided by the 2012 Policy's insuring clause.  As discussed

22  above, the bulk of L.A. Care's funding comes from its contract with DHCS.  Every

23  provider and member therefore could arguably contend that they are a third-party

24  beneficiary of that contract, including non-contracted providers, since the purpose of

25  the contract is to fund the provision of healthcare to the indigent residents of Los

26

27

28

Case No. 2:16-cv-04810-VAP(AGRx)

2193-1003 / 723283.1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1  Angeles County.  That is the very essence of L.A. Care's business.[10]  Reading the

2  exclusion so broadly would, in effect, eliminate all errors and omission coverage for

3  L.A. Care's managed care activities because they all arguably arise directly or

4  indirectly out of the DHCS contract.

5  Defendants contend that the 2012 Policy only provides coverage for those

6  **Claim Expenses** in excess of $250,000 – which expenses OBPI will calculate at

7  substantially discounted rates – that L.A. Care incurs in defense of a **Claim** by one of

8  its providers.  That very limited coverage cannot possibly be the result that L.A. Care

9  expected (or was told) when it paid a $140,000 premium for the 2012 Policy.  *Century*

10 *Sur. Co. v. Gene Pira, Inc.*, 2014 WL 6474987, at *3.

11 Moreover, the Defendants' proffered construction would render meaningless

12 the Policy's definitions of **Provider Selection**, **Claim Services**, and **Utilization**

13 **Review**, among others.  For example, **Provider Selection** (one of the activities

14 included within **Managed Care Activity**), includes, "evaluating, selecting,

15 credentialing, *contracting with* or performing peer review of *any provider* of **Medical**

16 **Services**." (Emphasis added.)  What happens when a provider contends that L.A.

17 Care wrongfully terminated her contract and has therefore suffered damages?  While

18 such a decision would plainly fall within L.A. Care's **Provider Selection** activities,

19 Defendants doubtless would contend the Exclusion (4) precludes coverage for any

20 breach of contract lawsuit brought by the provider because her alleged damages arise

21 out of a contract.

22 The 2012 Policy specifically also provides that "**Utilization Review** will

23 include . . . retrospective review of already rendered **Medical Services** or already

24 incurred costs" for the purposes of "evaluating [their] appropriateness, necessity or

25 cost."  How does this language not describe the very kind of activity described by

26 _____

27 [10]  As noted earlier, the Care 1st contract specifically disclaims any third party

28 beneficiaries.

2193-1003 / 723283.1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1 LHC in its Complaint against L.A. Care?  But, Defendants' tortured construction of

2 Exclusion (4) would render it meaningless, even with respect to a non-contracted

3 **Medical Services** provider.

4   Defendants' broad construction of Exclusion (4) should be rejected.  *See Safeco*

5 *Ins. Co. of America v. Robert S.*, 26 Cal. 4th 758, 765-766 (2001) (the Court should

6 reject the insurer's proffered construction of a policy's exclusionary clause if it would

7 render illusory the coverage provided by the policy's insuring clause); *Palmer v.*

8 *Truck Ins. Exch.*, 21 Cal. 4th 1109, 1116 (1999).

9   **D.    Exclusions (2) and (3) Also Do Not Apply to the Settlement**

10   Defendants also contend that L.A. Care's settlement with LHC is precluded by

11 two other exclusions to the Policy's definition of **Damages**:

12   **Damages** does not include:

13     (2)    any non-monetary or equitable relief or redress, including but not

14     limited to any cost or expense of complying with any injunctive, declaratory, or

15     administrative relief or specific performance award;

16     (3)    any payment, restitution, return, or disgorgement of any fee, profit,

17     royalty, premium commission, or charge, or any fund allegedly wrongfully or

18     unjustly held or obtained, including but not limited to any profit, remuneration

19     or advantage to which you were not legally entitled;

20   Neither of these two exclusions apply here.  Specifically, Exclusion (2) does

21 not apply because, by the time the LHC Action settled, the Superior Court had

22 sustained L.A. Care's demurrer to LHC's First Cause of Action for Declaratory

23 Relief, which was the *sole* basis for the equitable relief sought by LHC in its prayer

24 for relief.  Therefore, L.A. Care paid no portion of its settlement with LHC to resolve

25 the claim.

26   Exclusion (3) is directed to claims where restitution, return or disgorgement are

27 remedies specified by statute, such as for claims brought under California's Unfair

28 Competition Act, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, or False Advertising Act,

20

1  Cal. Bus. & Prof. Code §§ 17500, *et seq*.  *See* Cal. Bus. & Prof. Code § 17203.  In its

2  two remaining claims at the time of settlement, LHC claimed that it had been

3  "damaged to its detriment" as a result of L.A. Care's acts and omissions.  In its

4  prayer, LHC sought "damages in an amount to be proved at trial."  Exclusion (3)

5  simply does not apply.  *See AIU Ins. Co. v. Sup. Ct.*, , 51 Cal. 3d 807, 825-26 (1990)

6  (the plain and ordinary meaning of the term "damages" is monetary compensation

7  recovered by a party for "detriment," loss" or "injury" that the party has suffered

8  through the acts of another).

9       Defendants have raised no other defenses to coverage.  Consequently, as its

10  three defenses lack any merit, L.A. Care is entitled to judgment as a matter of law that

11  the 2012 Policy provides indemnification coverage for L.A. Care's loss.

12  **IV.**    **<u>DEFENDANTS HAVE BREACHED THE IMPLIED COVENANT OF</u>**

13         **<u>GOOD FAITH AND FAIR DEALING AS A MATTER OF LAW</u>**

14       L.A. Care purchased the 2012 Policy – and six prior Managed Care Errors &

15  Omissions from the Defendants – upon the belief that all those policies would provide

16  indemnification for claims that L.A. Care committed errors and omissions in its

17  managed care activities.  This belief was based on OBPI's representations, the prior

18  policies, the cover letters associated with them, and OBPI's underwriting materials.

19  Because it believed that the Defendants' policies covered the bulk of its managed care

20  activities, L.A. Care agreed to pay substantial premiums for each of the policies.  As

21  underwriter, OBPI was content to let L.A. Care maintain this belief.[11] In reality, if the

22  _____

23  [11]  L.A. Care also contends that Defendants falsely advertised the scope of their

24  policies' coverage to include L.A. Care's managed care activities.  Defendants used language in the prior six policies that OBPI underwrote, as well as in cover letters

25  accompanying those policies, to lead members of the general public to believe that

26  they would be covered under those policies for claims by providers of medical

27  services who were not contracted with L.A. Care.  In the interests of brevity, L.A. Care will not separately address its false advertising claim in this brief other than to

28

Case No. 2:16-cv-04810-VAP(AGRx)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1   Defendants' tortured construction of Exclusion (4) is followed, the coverage was

2   illusory.

3        Every contract of insurance in the State of California carries with it an implied

4   covenant of good faith and fair dealing, pursuant to which the parties agree, among

5   other things, not to take steps to deprive the other of the contract's rights and

6   remedies.  *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809, 818 (1979); *Comunale*

7   *v. Traders & General Ins. Co.*, 50 Cal. 2d 654, 658 (1958).  An entity that has not

8   issued an insurance policy may still be liable for bad faith breach if it acts as the

9   issuer's attorney-in-fact or alter ego.  *Gruenberg v. Aetna Ins. Co.*,, 9 Cal. 3d 566, 576

10  (1973).  *See also* Cal. Ins. Code § 769.85 (the acts of a managing general agent are

11  considered to be the acts of the insurer on behalf of the insurer on whose behalf it is

12  acting).

13       OBPI acted as Homeland's attorney-in-fact when it handled L.A. Care's claim

14  under the 2012 Policy.  Not only did it identify itself to L.A. Care as Homeland's

15  "claims manager," it authored the May 3, 2013 reservation of rights letter, the May

16  29, 2014 email refusing to participate in the mediation or contribute to any settlement

17  of the LHC Action, the July 16, 2014 restating that position and several subsequent

18  emails on Homeland's behalf.  Defendants have offered no evidence whatsoever that,

19  in authoring those communications and staking out those coverage positions, OBPI

20  was acting under any limitations whatsoever.  It had unlimited free reign.  It therefore

21  was Homeland's attorney-in-fact.  *See Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d at 576.

22

23

24  _____

25  point out that the Defendants' failure to disclose impending changes to an insurance

26  policy until after the actual issuance of the policy supports L.A. Care's claim for
    unfair competition under Cal. Bus. & Prof. Code §§ 17200, *et seq.  See, e.g., Pastoria*

27  *v. Nationwide Ins.*, 112 Cal. App. 4th 1490, 1496-1499 (2003).

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

An insurer breaches the implied covenant by failing to clearly communicate its coverage position in a timely fashion.[12]   *Fleming v. Safeco Ins. Co. of America, Inc.*, 160 Cal. App. 3d 31, 37 (1984).  Defendants' breach in this regard is manifest.  Even though it had apparently made the determination that there was "no apparent indemnity exposure" on April 25, 2013, OBPI (on Homeland's behalf) did not communicate this conclusion in its May 3, 2013 "reservation of rights" letter.  To the contrary, it told L.A. Care that, "coverage under the Policy has therefore been triggered."  At most, OBPI simply noted that LHC sought relief that did not *include* **Damages** (an observation that no longer applied after January 16, 2014, when the Superior Court issued its Minute Order).

OBPI did not communicate a coverage position to its insured *in any fashion* for over one year.  It was not until May 29, 2014, after it had been advised of the forthcoming July 21, 2014 mediation, that OBPI converted the "reservation of rights" letter into a coverage denial letter.  Even then, it cited Exclusions (2) and (3), which no longer applied, as grounds for its refusal.  The Defendants' conduct fell far outside the implied covenant as a matter of law.  *See, e.g., Silberg v. California Life Ins. Co.*, 11 Cal. 3d 452, 462 (1974) (an insurer violates the implied covenant of good faith and

_____

[12]  L.A. Care contends that the Defendants breached the implied covenant of good faith and fair dealing in several other ways, including: accepting premiums for a policy that they knew did not provide L.A. Care with the coverage it expected; failing to call L.A. Care's attention to a material change in policy language pertaining to coverage at the time it purchased the 2012 Policy; failing to investigate LHC's claim against L.A. Care thoroughly, objectively or reasonably; failing to assist L.A. Care in settling LHC's claim; and failing to provide accurate or timely information, despite numerous requests, for the SIR balance.  However, recognizing that the foregoing acts and omissions typically raise questions of fact, L.A. Care does not herein rely upon them in seeking summary judgment on this claim. It expressly reserves its right to claim these breaches in opposition to any motion by the Defendants and to adduce evidence of them at trial.

1  fair dealing as a matter of law by waiting to determine how an underlying proceeding

2  against its insured resolves before accepting or denying coverage).

3      As its damages arising from the Defendants' breach of the implied covenant,

4  L.A. Care is entitled to recover its settlement with LHC under the 2012 Policy, less

5  any remaining SIR balance.  As mentioned above, L.A. Care's "self-insured

6  retention" is $250,000, but it has never received an accurate accounting of the fees

7  and costs that the Defendants have credited towards that amount.  L.A. Care also is

8  entitled to recover all its damages proximately caused by the Defendants' tortious

9  breaches of the implied covenant of good faith and fair dealing.  These include its

10  attorneys' fees and costs incurred in this action to compel benefits due under the 2012

11  Policy.  *See Brandt v. Sup. Ct.*, 37 Cal. 3d, 813, 817 (1985). The precise amount of

12  those fees and costs can be submitted for *in camera* review by the Court in connection

13  with entry of Judgment

14  **V.      CONCLUSION**

15      Absent a dispute as to any material fact – and there is none here – the

16  interpretation of an insurance policy is a matter of law for the Court to resolve.  The

17  Defendants concede that the plain language of the 2012 Policy provides coverage for

18  the Claim brought against L.A. Care by LHC, one of its non-contracted providers.

19  Exclusion (4) to the definition of Damages does not by its plain language apply to the

20  resolution of a dispute with a non-contracted provider. And the Court should reject

21  the broad, tortured construction of Exclusion (4)  proffered by the Defendants because

22  it would render illusory the indemnification coverage of the 2012 Policy and would be

23  inconsistent with the policy's other terms.

24      For the reasons set forth herein, the Court should enter judgment as a matter of

25  law in favor of L.A. Care on its First Claim for Breach of Contract and its Second

26  Claim for breach of the implied covenant of good faith and fair dealing.

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1  Dated:  May 22, 2017                    Respectfully submitted,

2                                          **ZUBER LAWLER & DEL DUCA LLP**

3                                          DON A. HERNANDEZ
                                           AGNES M. SULLIVAN
4

5

6                               By:  ___/s/Don A. Hernandez___

7                                    Attorneys for Plaintiff LOCAL

8                                    INITIATIVE HEALTH AUTHORITY FOR
                                     LOS ANGELES  COUNTY, operating and
9                                    doing business as  L.A. CARE HEALTH
                                     PLAN
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2193-1003 / 723283.1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT